UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| GENEVIEVE IDAR, INDIVIDUALLY, and as REPRESENTATIVE OF THE ESTATE OF ██████████, DECEASED; and as NEXT FRIEND OF ███████████, A MINOR; and as NEXT FRIEND OF ███████████, A MINOR; and as NEXT FRIEND OF ██████████, A MINOR; and as NEXT FRIEND OF ██████████, A MINOR; and as NEXT FRIEND OF ██████████, A MINOR, | § § § § § § § § § § § | |
| Plaintiffs, | § § | CIVIL ACTION |
| V. | § § | NO. _____ |
| COOPER TIRE AND RUBBER CO., | § § | JURY TRIAL REQUESTED |
| Defendants. | § § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

COME NOW GENEVIEVE IDAR, INDIVIDUALLY, and as REPRESENTATIVE OF THE ESTATE OF ██████████, DECEASED; and as NEXT FRIEND OF ██████████, A MINOR; and as NEXT FRIEND OF ██████████, A MINOR; and as NEXT FRIEND OF ██████████, A MINOR; and as NEXT FRIEND OF ██████████, A MINOR; and as NEXT FRIEND OF ██████████, A MINOR, Plaintiffs, complaining of COOPER TIRE AND RUBBER CO.; Defendant, and for cause of action show as follows:

## I. PLAINTIFFS

1. Plaintiff Genevieve Idar is an individual and a citizen of Texas.

2.      Genevieve Idar is the natural and biological mother of ██████████, deceased.

3.      At the time of his death, ██████████ was an 11-year-old minor child, and he had no spouse, no children, no debts of his own, no will, and no assets beyond the causes of action which his estate is now bringing in this civil action.

4.      No administration is necessary for ██████████'s estate.

5.      ██████████'s sole heirs are her natural father and mother, Steven Idar and Genevieve Idar.

6.      ██████████'s mother Genevieve Idar is acting as the personal representative of his estate.

7.      Genevieve Idar is the natural and biological mother of ██████████, a minor, ██████████, a minor, ██████████, a minor, ██████████, a minor, and ██████████, a minor.

8.      Genevieve Idar brings suit individually for her own personal injuries, as a bystander who witnessed the tragic death and injuries of her children, for the wrongful death of her son ██████████, as heir and representative of the estate of ██████████ bringing his survival action, and as next friend of ██████████, ██████████, ██████████, ██████████, and ██████████ who are each bringing suit individually and as bystanders to the fatal and traumatic injuries of their siblings, including ██████████, deceased.

9.      All Plaintiffs are referred collectively as the "Idar family."

## II. DEFENDANT

10.     Defendant Cooper Tire and Rubber Co. ("Cooper") is a corporation organized and existing under the laws of Delaware and doing business in Texas as authorized, and this Defendant may be served through its registered agent for service of process, CT Corporation System, 350 N. St. Paul Street, Dallas, Texas 75201.

## III. JURISDICTION AND VENUE

11.     The members of the Idar family are citizens of the United States of America and the State of Texas and are residents of San Antonio, Bexar County, Texas.

12.     Cooper is a business entity created and existing under the laws of Delaware jurisdictionally diverse from the Idar family.

13.     The amount in controversy exceeds seventy-five thousand dollars.

14.     This Court has original jurisdiction under 28 USC §1332(a).

15.     Venue is proper in the Southern District of Texas, Corpus Christi Division, under 28 USC §1391 because a substantial part of the events or omissions giving rise to the claim occurred in Live Oak County, Texas.

## IV. FACTS AND CLAIMS

16.     On July 20, 2009, Amy Farmer Tamez was driving a 1995 Ford Aerostar on Texas Interstate Highway 37 in Live Oak County, Texas.

17.     The passengers in the Aerostar were Genevieve Idar, ▬▬▬▬, ▬▬▬▬ ▬▬, ▬▬▬▬, ▬▬▬▬, ▬▬▬▬, ▬▬▬▬, and Adelina Farmer

18.     As the Aerostar was traveling within the speed limit along the flat dry pavement, the tread suddenly separated from the vehicle's left rear tire and the vehicle went out of control and consequently rolled over as a result of the tire failure.

19.     ██████ was killed in this crash.

20.     Genevieve Idar, ████████, ████████, ████████, ████████, and ████████ were injured in this crash.

21.     The failed tire on the Aerostar that suffered the tread-belt separation was a P215/75R14 Cooper Trendsetter SE steel belted radial (DOT U9HB2T0803, referred to as "the Cooper Trendsetter tire") made in February of 2003 at Cooper's Tupelo Mississippi plant.

22.     Rawnsley Dibenedetto took the Aerostar and its Cooper Trendsetter to the Valvoline Instant Oil Change Store #AK1707 18 days before the tread separated from the Cooper Trendsetter.

23.     Valvoline Instant Oil Change Store #AK1707 inspected the Cooper Trendsetter 18 days before the tread separated from the tire.

24.     When Valvoline Instant Oil Change Store #AK1707 inspected the Cooper Trendsetter 18 days before the tread separated from the tire, the Cooper Trendsetter was more than six years past its manufacturing date.

25.     When Valvoline Instant Oil Change Store #AK1707 inspected the Cooper Trendsetter 18 days before the tread separated from the tire, the Cooper Trendsetter was less than ten years past its manufacturing date.

26.     In the decade before the Cooper Trendsetter was made, Cooper undertook to investigate the efficacy of the antidegradants and antioxidants in its belt rubbers.

27.     When Cooper undertook to investigate the efficacy of the antidegradants and antioxidants in its belt rubbers, Cooper recognized this investigation was necessary for the safety of its customers.

28.     In 2006, Cooper undertook to warn that Cooper tires ten years past their manufacture date should be removed from service but Cooper tires less than ten years past their manufacture date need not be removed from service.

29.     A true and correct copy of Cooper's Service Bulletin entitled "Service Life for Passenger Car, Light Truck, and Full-Size Spare Tires" is attached as Exhibit A to this Complaint.

30.     When Cooper undertook to warn that Cooper tires ten years past their manufacture date should be removed from service but Cooper tires less than ten years past their manufacture date need not be removed from service, Cooper understood that its warning would be relied upon.

31.     Cooper's warning that Cooper tires more than ten years past their manufacture date should be removed from service but Cooper tires less than ten years past their manufacture date need not be removed from service was issued more than two years before Valvoline Instant Oil Change Store #AK1707 inspected the Cooper Trendsetter 18 days in advance of the tread separation.

32.     Some other tire manufactures warn that tires should be removed from service before they are beyond six years past their manufacture date.

33.    Some vehicle manufacturers warn that tires should be removed from service before they are beyond six years past their manufacture date.

34.    Reasonably careful tire companies seek to warn that their tires should be removed from service before their antidegradant and antioxidant components of their belt rubbers cease to provide effective protection against degradation and oxidation.

35.    Reasonably careful tire companies seek to design their tires so that the antidegradant and antioxidant components of their belt rubbers remain effective during the time period while it is foreseeable that the tires will remain in service.

36.    Reasonably careful tire companies seek to manufacture their tires so that the antidegradant and antioxidant components of their belt rubbers remain effective during the time period while it is foreseeable that the tires will remain in service.

37.    The Cooper Trendsetter was researched, developed, designed, manufactured, inspected, tested, sold, evaluated in the field, warned about, and warranted by Cooper.

38.    When it designed, manufactured, marketed, and sold the Cooper Trendsetter, Cooper was in the business of designing, manufacturing, and selling tires such as the Cooper Trendsetter.

39.    The failed Cooper Trendsetter was defectively designed, defectively manufactured, and defectively marketed in a grossly negligent and malicious manner, and it was in an unreasonably dangerous and unfit condition at the time it left the control of Cooper.

40.     When Valvoline Instant Oil Change Store #AK1707 inspected the Cooper Trendsetter 18 days before the tread separated from the tire, the Cooper Trendsetter had substantially more than 2/32 of an inch of tread depth remaining.

41.     There was substantially more than 2/32 of an inch of tread depth remaining on the Cooper Trendsetter when the tread and top belt separated from the bottom belt and carcass.

42.     Reasonably careful tire companies seek to design tires so that the tread wears to 2/32 of an inch before it fails by separation of the tread and top belt from the bottom belt and carcass.

43.     Reasonably careful tire companies seek to manufacture tires so that the tread wears to 2/32 of an inch before it fails by separation of the tread and top belt from the bottom belt and carcass.

44.     The Cooper Trendsetter failed during its useful tread life as a result of a separation of the tread and upper belt from the lower belt and carcass.

45.     The premature failure of the Cooper Trendsetter as a result of a separation of the tread and upper belt from the lower belt and carcass was a result of manufacturing and design defects and maliciously and grossly negligent manufacturing and design practices.

46.     Aside from foreseeable wear and aging, the Cooper Trendsetter was in the same condition at the time of the crash as it was when it left Cooper's possession.

47.     The defective, unfit, and unreasonably dangerous conditions of the Cooper Trendsetter were a producing and proximate cause of the crash made the basis of this

civil action, the fatal injuries of ████████, and the severe injuries and damages sustained by the Idar family.

48.    Technologically and economically feasible safer alternative designs existed that would have prevented or significantly reduced the risk of injury and death without substantially impairing the tire's utility.

49.    The safer alternative designs include, but are not limited to, the use of proper rubber antidegradants including a proper antioxidant package in the belt rubber, the use of belt edge gums strips ("BEGS") or proper use of other belt edge rubber strips or wedges or insulation or wraps at the belt edges, the use of spirally-wound overwraps ("SNOW") or proper use of nylon or Kevlar belt reinforcements of the belt package whether used in strips or caps or belts or full-belt-width plies, the use of slower tire curing at lower temperatures, the use of proper innerliners with sufficient lapped splicing and sufficient rubber gauge and sufficient amounts of halobutyl rubber to guard against the permeation of air into the tire, and the use of other tire aging and separation countermeasures.

50.    Cooper makes tires for sale in the domestic market in the United States and also makes tires for sale in foreign markets outside of the United States.

51.    Cooper is aware of tire design practices employed by other tire manufacturers with plants in the United States.

52.    Cooper is aware of tire design practices employed by other tire manufacturers with plants in the United States as a result of Cooper's reverse engineering of other tire manufacturers' tires.

53.     Cooper is aware of tire design practices employed by other tire manufacturers with plants in the United States as a result of Cooper's access to Smithers' reports on other tire manufacturers' tires.

54.     Cooper designed and made the Cooper Trendsetter without using the most robust combination of antidegradants and antioxidants Cooper had available.

55.     When Cooper made the Cooper Trendsetter, Cooper was making other tires with more robust of antidegradants and antioxidants.

56.     Cooper does not use the most robust combination of antidegradants and antioxidants Cooper has available in the design or manufacture of the majority of its passenger car tires.

57.     When Cooper made the Cooper Trendsetter, the percentage of passenger car tires Cooper was selling in the domestic market in the United States with the most robust combination of antidegradants and antioxidants Cooper had available was smaller than the percentage of tires Cooper was selling in foreign markets outside of the United States with the most robust combination of antidegradants and antioxidants Cooper had available.

58.     Other tire manufacturers with plants in the United States use a more robust combination of antidegradants and antioxidants in the design and manufacture of the majority of their passenger car tires.

59.     When Cooper made the Cooper Trendsetter, Cooper was aware that other tire manufacturers with plants in the United States used a more robust combination of

antidegradants and antioxidants in the design and manufacture of the majority of their passenger car tires.

60.   Using a more robust combination of antidegradants and antioxidants is a proven design feature that increases a tire's ability to resist tread separations.

61.   When Cooper designed and made the Cooper Trendsetter without the most robust combination of antidegradants and antioxidants Cooper had available, Cooper was aware that using a more robust combination of antidegradants and antioxidants was a proven design feature that increases a tire's ability to resist tread separations.

62.   Cooper designed and made the Cooper Trendsetter without BEGS.

63.   When Cooper made the Cooper Trendsetter, Cooper was making other tires with BEGS.

64.   Cooper does not use BEGS in the design or manufacture of the majority of its passenger car tires.

65.   When Cooper made the Cooper Trendsetter, the percentage of passenger car tires Cooper was selling in the domestic market in the United States with BEGS was smaller than the percentage of tires Cooper was selling in foreign markets outside of the United States with BEGS.

66.   Other tire manufacturers with plants in the United States use BEGS – or other forms of rubber strips or insulation at the belt edges – in the design and manufacture of the majority of their passenger car tires.

67.   When Cooper made the Cooper Trendsetter, Cooper was aware that other tire manufacturers with plants in the United States used BEGS – or other forms of rubber

strips or insulation at the belt edges – in the design and manufacture of the majority of their passenger car tires.

68.     BEGS is a proven design feature that increases a tire's ability to resist tread separations.

69.     When Cooper designed and made the Cooper Trendsetter without BEGS, Cooper was aware that BEGS was a proven design feature that increases a tire's ability to resist tread separations.

70.     Cooper designed and made the Cooper Trendsetter without SNOW.

71.     When Cooper made the Cooper Trendsetter, Cooper was making other tires with SNOW.

72.     Cooper does not use SNOW in the design or manufacture of the majority of its passenger car tires.

73.     When Cooper made the Cooper Trendsetter, the percentage of passenger car tires Cooper was selling in the domestic market in the United States with SNOW was smaller than the percentage of tires Cooper was selling in foreign markets outside of the United States with SNOW.

74.     Other tire manufacturers with plants in the United States use SNOW – or other forms of nylon or Kevlar reinforcement of the belt package – in the design and manufacture of the majority of their passenger car tires.

75.     When Cooper made the Cooper Trendsetter, Cooper was aware that other tire manufacturers with plants in the United States used SNOW – or other forms of nylon

or Kevlar reinforcement of the belt package – in the design and manufacture of the majority of their passenger car tires.

76.     SNOW is a proven design feature that increases a tire's ability to resist tread separations.

77.     When Cooper designed and made the Cooper Trendsetter without SNOW, Cooper was aware that SNOW is a proven design feature that increases a tire's ability to resist tread separations.

78.     Cooper made the Cooper Trendsetter with a faster cure at a higher curing temperature as compared to other tires Cooper has made.

79.     When Cooper made the Cooper Trendsetter, Cooper was making other tires with a slower cure at a lower curing temperature.

80.     Other tire manufacturers with plants in the United States made tires using slower cures at lower curing temperatures in the manufacture of a majority of their passenger car tires.

81.      When Cooper made the Cooper Trendsetter with a faster cure at a higher temperature, Cooper was aware that other tire manufacturers with plants in the United States made tires using slower cures at lower curing temperatures in the manufacture of a majority of their passenger car tires.

82.     Making tires using slower cures at lower curing temperatures is a proven manufacturing process that increases a tire's ability to resist tread separations.

83.     When Cooper designed and made the Cooper Trendsetter with a faster cure at a higher curing temperature, Cooper was aware that making tires using slower cures at

lower curing temperatures was a proven manufacturing process that increases a tire's ability to resist tread separations.

84.    Cooper designed and made the Cooper Trendsetter with an innerliner of a thinner gauge or with a lower percentage of halobutyl rubber (or both) as compared other tires Cooper made.

85.    When Cooper made the Cooper Trendsetter, Cooper was making other tires with an innerliner of a thicker gauge or with a high percentage of halobutyl rubber (or both).

86.    Other tire manufacturers with plants in the United States use innerliners of a thicker gauge or of a higher percentage of halobutyl rubber (or both) as compared to the Cooper Trendsetter in the design and manufacture of the majority of their passenger car tires.

87.    When Cooper made the Cooper Trendsetter, Cooper was aware that other tire manufacturers with plants in the United States used innerliners of a thicker gauge or of a higher percentage of halobutyl rubber (or both) as compared to the Cooper Trendsetter in the design and manufacture of the majority of their passenger car tires.

88.    The use of innerliners of a thicker gauge or a higher percentage of halobutyl rubber (or both) as compared to the Cooper Trendsetter is a proven design feature that increases a tire's ability to resist tread separations.

89.    When Cooper designed and made the Cooper Trendsetter with the innerliner it used, Cooper was aware that use of innerliners of a thicker gauge or a higher

percentage of halobutyl rubber (or both) as compared to the Cooper Trendsetter is a proven design feature that increases a tire's ability to resist tread separations.

90.     Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge that its tires were in need of improved durability with respect to the tires' susceptibility to belt and tread separations.

91.     Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge that its tires would achieve improved durability with respect to the tires' susceptibility to belt and tread separations with the addition of a strip of rubber at the belt edges.

92.     Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge that its tires would achieve improved durability with respect to the tires' susceptibility to belt and tread separations with the addition of a nylon reinforcement of the belt package.

93.     Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge that a major automotive manufacturer had assessed Cooper's tire technology and concluded it was lagging behind the tires made by Cooper's competitors.

94.     Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge of other tire companies' alternative tire designs by virtue of reverse engineering those tires and comparing their designs with Cooper designs.

95.     Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge of other tire companies' alternative tire designs by virtue of access to Smithers' reports on competitors tires.

96.     Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge of the properly understood role of perforations in tire failures as a result of its tire perforation studies.

97.     Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge of the means of improving its tires' resistance to belt and tread separations as a result of its technical correspondence regarding radial passenger tires and improved separation resistance.

98.     Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge of the causes of belt and tread separations as a result of its documentation listing the causes of tread separation.

99.     Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge of the causes of belt and tread separations as a result of its tire durability meetings.

100.    Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge of the causes of belt and tread separations as a result of its correspondence with plant chemists.

101.    Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge of the causes of belt and tread separations as a result of its correspondence regarding changes to belt stock.

102.    Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge of the causes of belt and tread separations as a result of its documentation of tire durability action items.

103.    Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge of the causes of belt and tread separations and how to mitigate them as a result of position papers on nylon overlays.

104.    Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge of the causes of belt and tread separations as a result of its nylon discussion papers.

105.    Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge of a growing trend beginning less than a decade before the tire at issue was made toward increasing numbers of radial passenger separation adjustments among Cooper tires.

106.    Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge of a growing trend beginning less than a decade before the tire at issue was made toward dramatically increasing numbers of liability claims involving failed Cooper tires, both domestically and in the Middle East.

107.    Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge that Cooper's passenger tires need improved separation resistance at least since 1996.

108.   Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge that Cooper's tires were evaluated for an improved antidegradant and antioxidant aspect to its tire rubbers.

109.   Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge that Cooper's tire separation history warranted involvement of its consumer relations department and necessitated improved durability at least since 1997.

110.   Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge that Cooper personnel acknowledged by reports, emails, memos, and other documents this increase in tread separations at least since 1998.

111.   Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge that Cooper personnel acknowledged by reports, emails, memos, and other documents the significance of these increasing tread separations and acknowledged this trend's relation to customer satisfaction at least since 1999.

112.   Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge that Cooper personnel acknowledged by reports, emails, memos, and other documents the need for setting goals for reducing tread separation adjustments at least since 1999.

113.   Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge that Cooper personnel

acknowledged by reports, emails, memos, and other documents the need for reevaluating Cooper's belt rubber at least since 1999.

114.   Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge that Cooper personnel acknowledged by reports, emails, memos, and other documents the worrisome increase in seventh generation tire separations at least since 1999.

115.   Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge that Cooper personnel acknowledged by reports, emails, memos, and other documents the need for a tire durability team to document the causes of tread separations in Cooper's tires to separate at least since 1999.

116.   Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge of Cooper personnel traveling through the southwestern region of the United States and documenting the increases in tread separation.

117.   Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge of Cooper personnel discussing and documenting the need to implement a more robust antidegradant and antioxidant aspect to the belt compound.

118.   Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge of Cooper personnel

discussing and documenting the cost-benefit analysis of improving the antidegradant and antioxidant aspect of Cooper's tire rubbers.

119.   Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge of Cooper personnel discussing and documenting weighing the various costs associated with improving the design of Cooper's tires by adding BEGS, by adding nylon belt reinforcement, or adding antidegradant and antioxidant aspect of Cooper's tire rubbers.

120.   Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge of Cooper personnel discussing and documenting the desire to address weaknesses in the design of Cooper tires without spending money to improve the tires' designs.

121.   Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge of Cooper personnel discussing and documenting the foreseeability of a loss of control and consequent fatal or injurious crash as a result of a tire failure at highway speeds.

122.   Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge of Cooper personnel discussing and documenting the imperative nature of improving the durability of Cooper's tires and Cooper's responsibility to implement such design improvements.

123.   Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge of Cooper personnel discussing and documenting the use of BEGS and other forms of belt edge rubber by

Cooper's competitors in the tire industry as a means of insulating the high-stress area of the tire at the belt edges.

124.   Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge of Cooper personnel discussing, documenting, and reporting that the use of BEGS would be a good addition for Cooper's tire designs.

125.   Cooper has possession of documents, testimony, and information that confirm Cooper made the Cooper Trendsetter despite knowledge of Cooper personnel discussing and documenting a proposed action plan to reduce tread separation in Cooper tires that would lower cure temperatures and incorporate BEGS in tire designs.

126.   Cooper has possession of documents, testimony, and information which confirm that its manufacturing practices include or have included applying solvent in an attempt to restore the tackiness to dried or aged tire rubber components which were not promptly used to build tires before the rubber's tack deteriorated.

127.   Applying solvent in an attempt to restore the tackiness to dried or aged tire rubber components which were not promptly used to build tires before the rubber's tack deteriorated is a disfavored tire manufacturing practice.

128.   Cooper has possession of documents, testimony, and information which confirm that its manufacturing practices include or have included building tires after the use of solvent in an attempt to restore the tackiness to dried or aged tire rubber components despite Cooper employee concerns that this application of solvent could cause the tire to separate when used by customers.

129.   Cooper has possession of documents, testimony, and information which confirm that its manufacturing practices include or have included failing to promptly repair roof leaks in the tire building room that allowed rainwater to drip on tire components and tire building machines, which were not always shut down under such circumstances.

130.   Failing to promptly repair roof leaks in the tire building room in a manner that allows rainwater to drip on tire components and tire building machines, and then not always shutting down the tire building machines under such circumstances is a disfavored tire manufacturing practice.

131.   Cooper has possession of documents, testimony, and information which confirm that its manufacturing practices include or have included building tires after they had moisture on the components despite Cooper employee concerns that practice could cause the tire to separate when used by customers.

132.   Cooper has possession of documents, testimony, and information which confirm that its manufacturing practices include or have included using awls and hot-knives to deflate blisters in tires.

133.   Using awls and hot-knives to deflate blisters in tires is a disfavored tire manufacturing practice.

134.   Cooper has possession of documents, testimony, and information which confirm that its manufacturing practices include or have included paying tire building employees on a bonus incentive system based on quantity in production that discouraged

the scrapping of bad tires and out-of-specification tire components and undermined the production of safe tires.

136. Cooper has possession of documents, testimony, and information which confirm that its manufacturing practices include or have included selling repaired tires as tires that never needed repair.

136. Cooper has possession of documents, testimony, and information which confirm that its manufacturing practices include or have included having a quality inspection so lax that it failed to prevent foreign objects from being cured into tires.

137. Cooper has possession of documents, testimony, and information which confirm that its manufacturing practices include or have included modifying tire inspections or falsifying results to wrongfully ensure the tires would pass quality control inspections and audit inspections by brand inspectors.

138. Cooper has possession of documents, testimony, and information which confirm that its manufacturing practices include or have included pre-selecting non-representative stock specimens to convey a false impression of workmanship to brand inspectors.

139. Cooper has possession of documents, testimony, and information which confirm that its manufacturing practices include or have included allowing insufficient time for inspectors to cover all of the inspection criteria they were tasked to address as a result of insufficient numbers of inspectors on staff in relation to the volume of tire production.

140.   Cooper has possession of documents, testimony, and information which confirm that its manufacturing practices include or have included curing at overheated temperatures to increase production by accelerating cure time.

141.   Cooper has possession of documents, testimony, and information which confirm that its manufacturing practices include or have included the use of piece roll tire components which promoted the stacking of rubber components on the unclean floor where those components were subject to contamination.

142.   Cooper has possession of documents, testimony, and information which confirm that its manufacturing practices include or have included the use of rejected materials to build tires with these "red tagged" components despite the fact that they had been scrapped.

143.   Cooper has possession of documents, testimony, and information which confirm that its manufacturing practices include or have included the insufficient use of x-rays to detect air or steam pockets and other contaminants.

144.   Cooper has possession of documents, testimony, and information which confirm that its manufacturing practices include or have included the failure to scrap tires built before erroneous tire building machine specifications were corrected in the middle of a shift.

145.   Cooper has possession of documents, testimony, and information which confirm that its manufacturing practices include or have included the failure to accurately measure chemical components used in mixing tire rubbers and the failure to appropriately test those rubbers before they were used in tire production.

146.   Cooper has possession of documents, testimony, and information which confirm that its manufacturing practices include or have included the reworking of "red tag" materials back into the tire production process.

147.   Cooper has possession of documents, testimony, and information which confirm that its manufacturing practices include or have included the failure to control temperature and humidity at the plant which promoted moisture contamination by sweat and condensation.

148.   Cooper has possession of documents, testimony, and information which confirm that its manufacturing practices include or have included the use of creel wire despite its failure of humidity testing.

149.   Cooper has possession of documents, testimony, and information which confirm that its manufacturing practices include or have included the failure to perform required testing when the testing computer system was inoperable.

150.   Cooper has possession of documents, testimony, and information which confirm that its manufacturing practices include or have included employing less rigorous testing and inspection and certification on passenger car tires as contrasted with more rigorous processes on truck tires.

151.   Cooper has possession of documents, testimony, and information which confirm that it has established a link between certain cured tire defects and their probable causes.

152.   Cooper has possession of documents, testimony, and information which confirm that it has established a link between nonconformance to standards and tread separations.

153.   Cooper has possession of documents, testimony, and information which confirm that it has documents at a repository in Toledo, Ohio, which contains documents about its manufacturing processes and which are documents which Cooper has previously represented do not exist.

154.   Cooper has possession of documents, testimony, and information which confirm that it has allowed persons tour its tire manufacturing plants without requiring that they sign a confidentiality agreement.

155.   Cooper has possession of documents, testimony, and information which confirm that it has been ordered to allow litigants to tour its tire manufacturing plants.

156.   Cooper has possession of documents, testimony, and information which confirm that some major automotive manufacturers have considered Cooper's manufacturing practices and concluded that they lag behind other tire manufacturer's practices.

157.   Cooper has possession of documents, testimony, and information which confirm that Cooper has knowledge of tire design features employed by other tire manufacturers.

158.   Cooper has possession of documents, testimony, and information which confirm that Cooper does not routinely employ some tire design features routinely employed by other tire manufacturers.

159.   Cooper has possession of documents, testimony, and information which confirm that Cooper has knowledge of tire design features employed by other tire manufacturers as a result of Smithers' reports.

160.   Cooper has possession of documents, testimony, and information which confirm that Cooper has knowledge of tire design features employed by other tire manufacturers as a result of reverse engineering other manufacturers' tires.

161.   Cooper negligently undertook to give warnings with regard to the dangers from tires as old as the Cooper Trendsetter which were dangers known by Cooper.

162.   Cooper failed to give adequate instruction and warnings to avoid dangers from over aged tires, which failure rendered the Cooper Trendsetter unreasonably dangerous as marketed.

163.   Cooper undertook to perform services, which it knew or should have known were necessary for the Idar family's protection, by implementing the communication of a product warning regarding the dangers of its aged tires.

164.   Cooper failed to exercise reasonable care in performing those warning services which it undertook, those services were relied upon, and Cooper's performance in this regard increased the Idar family's risk of harm.

165.   There are no applicable mandatory safety standards regarding the risk of tread separations.

166.   The safety standard regulations regarding tires are inadequate to protect the public from unreasonable risks of injury.

167.    One reason for the safety standard regulations regarding tires are inadequate has been Cooper's lack of candor in connection with the government's determination of the adequacy of tire regulations.

168.    The Idar family performed all conditions precedent prior to filing this civil action and gave presuit notice of claims, attached.

## V. <u>DAMAGES</u>

169.    As a producing, direct and proximate result of the incident, injuries, and damages for which defendant is liable, the Idar family seeks and are entitled to general, special, economic and non-economic, and survival damages, as applicable to the Idar family, in an amount in excess of the minimum jurisdictional limits of the court, as determined to be just and fair by the jury.  Such damages include, but are not necessarily limited to pecuniary loss in the past and future; loss of consortium, familial joy, companionship and society, and enjoyment of life in the past and future; mental anguish in the past and future; loss of services in the past and future; loss of inheritance; loss of community estate and addition to estate; pain and mental anguish; medical expenses; funeral and burial expenses; pain and mental anguish in the past and future; lost earnings and loss of earning capacity in the past and future; disfigurement in the past and future; physical impairment in the past and future; medical expenses in the past and in the future; and all other damages allowed by law and equity.

169.    The damages sought are greatly in excess of the minimum jurisdictional limits of the court.

## VI.  <u>DEMAND FOR JURY TRIAL</u>

170.    The Idar family demands a trial by jury on all issues herein set forth.

## VII. **PRAYER**

WHEREFORE, PREMISES CONSIDERED, the Idar family prays that this cause be set for trial before a jury, and that the Idar family recover judgments of and from Defendant for actual damages in such amount as te evidence may show and the jury may determine to be proper, together with pre-judgment interest, post-judgment interest, reasonable attorneys' fees, cost of court, and such other and further relief to which they may show themselves to be justly entitled.

Respectfully submitted,

By:    /s/ John Blaise Gsanger
       John Blaise Gsanger
       State Bar No. 00786662
       THE EDWARDS LAW FIRM
       1400 Frost Bank Plaza (78470)
       P. O. Box 480
       Corpus Christi, Texas 78403-0480
       Telephone: (361) 698-7600
       Facsimile: (361) 698-7614

       ATTORNEYS FOR PLAINTIFFS

# SERVICE BULLETIN

No. 112

## Service Life for Passenger Car, Light Truck and Full-size Spare Tires

Tires are designed and built to provide many thousands of miles of excellent service. For continued, safe use throughout the service life of the tire, consumers must properly maintain their tires and have them regularly inspected for signs of damage and abuse that can result in tire disablement. The end of the service life of a tire is affected by many factors that are independent of the chronological age of the tire. The following information and recommendations are provided to assist the public in maximizing tire service life and to define conditions and practices affecting the service life of a tire.

### Service Life is Not Determined by Chronological Age

The useful life of a tire is a function of service and storage conditions. For each individual tire, this service life is determined by many elements such as temperature, storage conditions, and conditions of use (e.g., load, speed, inflation pressure, impacts and road hazard damage) to which a tire is subjected throughout its life. Since service and storage conditions vary widely, accurately predicting the service life of any specific tire based on calendar age is not possible.

### Tire Service Life Recommendation

Cooper Tire is not aware of scientific or technical data that establishes or identifies a specific minimum or maximum service life for passenger and light truck tires. However, Cooper recognizes a consumer benefit from a more uniform, global industry-wide approach to the tire service life issue. Accordingly, Cooper recommends that all tires, including full-size spares, that are 10 or more years from their date of manufacture, be replaced with new tires. Tires 10 or more years old should be replaced even if the tires appear to be undamaged and have not reached their tread wear limits. Most tires will need replacement before 10 years due to service conditions. This may be necessary even if the tire has not yet reached its tread wear limits.

Under no circumstances should a "maximum" service life recommendation for a tire be considered as an "expected" service life. Tires must be removed from service for several reasons, including tread worn down to minimum depth, signs of damage (cuts, cracks,

bulges, impact damage, vibration, etc.) or signs of abuse (under inflation, overloading, improper repair, etc.).

In some cases a vehicle manufacturer may make a recommendation for tire replacement earlier than 10 years for their products based upon their understanding of the specific vehicle characteristics and application. If so, the consumer should follow those vehicle manufacturer's specific recommendations for their vehicle.

## Determining the Age of a Tire

A tire's date of manufacture is located on each tire. A consumer can determine the date of manufacture by examining the series of letters and numbers called the Tire Identification Number (TIN) which follow the letters "DOT" on the tire sidewall.

For tires manufactured after the year 1999, the last four numbers of the TIN identify the week and year in which the tire was manufactured. The first two numbers identify the week and the last two numbers identify the year of manufacture. Thus, a TIN ending with "3005" indicates that the tire was made during the 30th week of 2005 and would appear as DOTXXXXXXX3005 on the sidewall of the tire.

For tires manufactured prior to 2000, three numbers instead of four indicate the date of manufacture. The first two numbers reflect the week and the last digit reflects the year of manufacture. Thus, a TIN ending in 308 indicates that the tire was made in the 30th week of 1998 (or possibly 1988) and would appear as DOTXXXXXXX308 on the sidewall of the tire.

## The Consumer Plays the Primary Role in Tire Maintenance

Consumers have the primary responsibility for the regular care and maintenance of their tires. Tires should be inspected at least once per month. The regular inspection should focus on proper inflation pressure, tread wear and tire/wheel damage as detailed below. Having tread depth above the legal limit does not determine the service life of a tire. Tires must be properly maintained and routinely inspected for continued safe and proper use — even when tread depth remains. Tires may need to be taken out of service even when tread depth above the legal limit remains. Regular inspection becomes particularly important the longer a tire remains in use.

This monthly inspection should be supplemented by periodic rotation, balancing and alignment services. Inspection should occur whether or not the vehicle is equipped with a tire pressure monitoring system.

**Recommended Maintenance Practices to Maximize Tire Service Life**

**Good maintenance practices include the following:**

- Consumers should check tire pressure regularly (at least monthly, and before all long trips) and re-inflate tires to the pressure specified on the vehicle's placard or manual.  Pressure should be checked when tires are "cold"; in other words, before they have been driven.  Driving, even for a short distance, causes tires to heat up and air pressure to increase.  If the consumer notes regular loss of tire pressure, the consumer should have the tire(s) immediately inspected by a tire service professional.  Routine tire pressure checks and re-inflation of tires to placard pressure must be made — even if the vehicle is equipped with a tire pressure monitoring system.

- Consumers should inspect their tires for cuts, cracks, splits, irregular wear, vibrations, or bulges in the tread and sidewall areas.  These conditions may indicate a separation within the tire body.  If any of these abnormal conditions are observed or suspected, the consumer should have the tire immediately inspected by a tire service professional.  It may be necessary to remove the tire from the wheel for a complete inspection.  Cooper recommends that the consumer arrange for this inspection whenever the tires are scheduled to be rotated.

- After striking or impacting anything unusual in the roadway, a tire service professional should demount the tire and conduct a visual and tactile inspection of the tire for damage.  This is necessary because a tire may not have visible signs of damage on its outer surface.

- Tires should be inspected for adequate tread depth.  When the tire is worn to the level of the built-in indicators at 2/32nd inch (1.6 millimeters); or, if at any location on the tire the tread groove depth is less that 2/32nd inch; or, if the tire cord, steel or fabric is exposed, the tire is dangerously worn and must be replaced immediately.

- Tires should be inspected for uneven wear.  Wear on one side of the tread or flat spots in the tread may indicate a problem with the tire or vehicle.  Consult with a tire service professional.

- Rims, valves, valve stems, valve caps and lug nuts should also be inspected regularly.  Bent or cracked valve stems or rims, or missing lug nuts or valve caps must be replaced.

- The spare tire should be maintained and inspected in the same manner and with the same frequency as all other tires on the vehicle.

3

**Storage, Rotation, and Other Conditions That May Affect Tire Service Life**

Tires should always be stored in a dry, cool, well-ventilated place.  Avoid storing tires in areas that are exposed to wetness, petroleum or petroleum-based products, extreme temperatures, direct sunlight, and/or other sources of ozone, such as electric motors. Storage areas should also be clean and free of grease, gasoline or any corrosive chemicals which can deteriorate rubber.

If a vehicle is fitted with a matching full-size spare tire the consumer should follow the vehicle manufacturer's recommendation for rotating the spare tire.  In the absence of a manufacturer's recommendation, Cooper recommends a five tire rotation, including the spare tire.  When any spare tire is placed into service, its inflation pressure must be checked.

Besides monthly inspection of their tires' visual condition, consumers must also be aware of any change in dynamic performance such as increased air loss, noise or vibration. These conditions could be caused by internal damage to the tire and may require that the tire be removed from service immediately to prevent a tire disablement.  Cooper recommends that consumers consult a tire service professional if any dynamic performance issues are noted.


**Additional Information**

Tire care and service manuals and DOT code information are available from the Rubber Manufacturers' Association (RMA) on its website, www.rma.org; and, additional tire care information and safety information are available on Cooper Tire's website at www.Coopertire.com.

You can order additional copies of this Service Bulletin through the Consumer Relations Department, Cooper Tire & Rubber Company, Findlay, Ohio 45840 or call 1-800-854-6288.  If you wholesale tires to other dealers (sub-dealers), each should receive a copy of this Service Bulletin.

# THE EDWARDS LAW FIRM

ATTORNEYS AT LAW

P. O. BOX 480

CORPUS CHRISTI, TEXAS 78403-0480

(361) 698-7600

JOHN BLAISE GSANGER
BOARD CERTIFIED
CIVIL APPELLATE LAW
TEXAS BOARD OF LEGAL SPECIALIZATION

June 9, 2010

FROST BANK PLAZA
SUITE 1400  78470
FAX: (361) 698-7614

Mr. James E. Kline
Vice President, General Counsel and Secretary
Cooper Tire & Rubber Company (Law Department)
701 Lima Avenue, P.O. Box 550
Findlay, Ohio 45840
*Via Fax: (419) 424-7320*

Re:     7/20/09 crash of 1995 Ford Aerostar due failure of P215/75R14 Cooper Trendsetter SE tire,
        (DOT#U9HB_2T0803) on Texas IH 37 in Live Oak County, Texas.

Dear Mr. Kline:

Under cover of this letter, I am forwarding notice of claims and a request for preservation of evidence.
You are welcome to contact me if you have any questions.

Best regards,

THE EDWARDS LAW FIRM

John Blaise Gsanger

# THE EDWARDS LAW FIRM

### ATTORNEYS AT LAW
P. O. BOX 480
CORPUS CHRISTI, TEXAS 78403-0480
(361) 698-7600

JOHN BLAISE GSANGER
BOARD CERTIFIED
CIVIL APPELLATE LAW
TEXAS BOARD OF LEGAL SPECIALIZATION

March 21, 2010

FROST BANK PLAZA
SUITE 1400   78470
FAX: (361) 698-7614

Mr. Christopher Trent
Johnson, Trent, West & Taylor, LLP
919 Milam, Suite 1700
Houston, Texas 77002
*Via Fax: (713)222-2226*

Re:   7/20/09 crash of 1995 Ford Aerostar due failure of P215/75R14 Cooper Trendsetter SE tire,
(DOT#U9HB_2T0803) on Texas IH 37 in Live Oak County, Texas.

Dear Mr. Trent:

I am writing to you in your capacity as counsel for Cooper Tire and Rubber Co.

I represent Genevieve Idar, ███████████, ██████████, █████████, ██████████, ██████████, the Estate of ████████, and I am writing to give you notice of strict product liability, gross negligence, malice, DTPA, warranty, and post-sale negligent undertaking claims against Cooper in connection with the losses suffered by my clients as a result of the failure of a Cooper Trendsetter SE tire, bearing DOT#U9HB_2T0803.

In light of the anticipated litigation, please preserve all evidence relevant to this matter, including – but certainly not limited to – the contact information for the tire builders and tire inspectors working at the Tupelo plant in the Winter of 2003, the trial testimony and depositions and other witness statements of those who have knowledge of the conditions at the Tupelo plant and the historical reasons for Cooper's failure to incorporate BEGS and SNOW and rubbers with enhanced antioxidants in the failed tire, the training and work procedure materials for tire builders and tire inspectors working at the Tupelo plant, the training and work procedure materials for inspectors working at Cooper's regional inspection points, the complete reaction limits and tolerances and complete tire building manuals (all versions) and complete final finish inspection standards applicable to Cooper Trendsetter SE tires made at the Tupelo plant, the specifications and tolerances for the P215/75R14 Cooper Trendsetter SE tires and the alternative design specifications for other P215/75R14 tires made by Cooper in 2003 with additional design features which were omitted from the P215/75R14 Cooper Trendsetter SE, Steel Belted Radial's design.

You and your client are welcome to inspect the tire at my office if you wish.  You are welcome to inspect the tire at any mutually convenient time and you are welcome to inspect it for as long as you wish and as often as you wish, but this original evidence must remain in my custody while you inspect it under Texas Rule of Civil Procedure 196.3(b).

Best regards,

THE EDWARDS LAW FIRM

John Blaise Gsanger