UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


GENEVIEVE IDAR,                )        CASE NO:  2:10-CV-217
                              )
            Plaintiff,        )            CIVIL
                              )
    vs.                       )     Corpus Christi, Texas
                              )
COOPER TIRE & RUBBER CO.,     )   Monday, February 28, 2011
                              )
            Defendant.        )     (3:24 p.m. to 4:06 p.m.)


TELEPHONE CONFERENCE

BEFORE THE HONORABLE JANIS GRAHAM JACK,
UNITED STATES DISTRICT JUDGE


Appearances:            See Next Page

Court Recorder:         Velma Gano; FTR

Courtroom Clerk:        Sondra Scotch

Transcriber:            Exceptional Reporting Services, Inc.
                        P.O. Box 18668
                        Corpus Christi, TX 78480-8668
                        361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES FOR:**


Genevieve Idar:                JOHN BLAISE GSANGER, ESQ.
                              The Edwards Law Firm
                              P.O. Box 480
                              Corpus Christi, Texas 78403


Cooper Tire & Rubber:          DARRELL LEE BARGER, ESQ.
                              Hartline Dacus, et al.
                              800 N. Shoreline Blvd.
                              Suite 2000, North Tower
                              Corpus Christi, Texas 78401

                              RAPHAEL CHARLES TAYLOR, ESQ.
                              Johnson Trent, et al.
                              919 Milam St.
                              Suite 1700
                              Houston, Texas 77002


Intervenor Plaintiff,          WESLEY TODD BALL, ESQ.
Steven Allen Idar:            Farrar Ball, LLP.
                              1010 Lamar
                              Suite 1600
                              Houston, Texas 77002

1       <u>**Corpus Christi, Texas; Monday, February 28, 2011; 3:24 p.m.**</u>

2                                   **(Call to Order)**

3              **THE CLERK:**  Court calls Civil Action C-10-217, *Idar*

4       *versus Cooper Tire and Rubber Company.*  May I have appearances,

5       please?

6              **MR. GSANGER:**  John Gsanger appearing on behalf of the

7       Idar Plaintiffs.

8              **MR. BALL:**  Wesley Ball appearing on behalf of

9       Mr. Idar.

10             **MR. TAYLOR:**  Raph Taylor here on behalf of Cooper

11      Tire and Rubber Company.

12             **MR. BARGER:**  Your Honor, Darrell Barger on behalf of

13      Cooper.  I filed Notice of Additional Counsel late last Friday

14      and Mr. Taylor and his firm and Mr. Trenton are still attorney

15      of record as far as lead counsel.

16             **THE COURT:**  All right, thank you.  So should we go

17      down -- there's some discovery dispute; is that -- disputes; is

18      that right?

19             **MR. GSANGER:**  That's correct, your Honor.

20             **THE COURT:**  I'm sorry.  You have to identify yourself

21      when you speak.

22             **MR. GSANGER:**  Oh, I'm sorry.  This is John Gsanger.

23      I apologize.

24             **THE COURT:**  Where do you want to start, with the

25      request for production?

1          **MR. GSANGER:**  Yes, that would probably make the most

2    sense, I believe.

3          **THE COURT:**  Okay, go ahead.

4          **MR. GSANGER:**  Well, your Honor, at the original

5    pretrial conference we talked about the fact that we

6    anticipated that Cooper would be producing those documents

7    which we had in our possession and which our experts already

8    had in their possession from other cases.  We mentioned the *Toe*

9    case, the case in Iowa, and we also mentioned the *Petersen* case

10   and in the *Petersen* case, you know, I have gone ahead and

11   further identified which specific documents we wanted by Bates

12   number and so our first request for production, you know, we

13   basically said, hey, can we have the documents that we had been

14   asking you to produce in pre-suit letters asking you to

15   preserve the evidence.  Can we ask -- can we have you to

16   produce the documents we have referenced?

17          In the letters, we said, would you please disclose

18   these and then finally we sent a request for production because

19   we didn't get them through disclosure saying, okay, please

20   produce the *Toe* documents and the *Petersen* documents.  If you

21   would rather not go through and, you know, produce the *Toe* and

22   *Petersen* documents, we have them laid out by category but if

23   you would just produce the *Toe* and *Petersen* documents, you

24   don't even have to mess with going through the categories.

25   Just give us the documents which we have and which our experts

1  already have in their possession but produce them, please, in

2  this case.  That's the nature of the first request for

3  production.

4          THE COURT:  Okay.  And the response?

5          MR. TAYLOR:  Raph Taylor, Cooper Tire.  May I

6  respond?

7          THE COURT:  Yes.

8          MR. TAYLOR:  Thank you.  When we were there for the

9  initial pretrial conference, Cooper had not yet been afforded

10  an opportunity to even examine the subject tire and so at that

11  point in time it was very difficult to ascertain just how far

12  attenuated the Plaintiff's request for the *Toe* documents and

13  the *Petersen* documents would really be from the subject tire

14  and in fact in this case the subject tire was built in February

15  of 2003 and we know where it was built in Tupelo, Mississippi

16  and we obviously know to what specific Green Tire Specification

17  and blueprint that it was manufactured to.

18          We have submitted to the Court an affidavit from Tony

19  Franklin differentiating very clearly the types of tires at --

20          THE COURT:  I'm sorry.  I don't --

21          MR. TAYLOR:  -- issue here, the Idar tire --

22          THE COURT:  -- I don't have an affidavit.

23          MR. TAYLOR:  It was -- we filed it this morning with

24  a motion --

25          THE COURT:  Well, that was struck.

1            **MR. TAYLOR:**  -- related to the --

2            **THE COURT:**  Yeah, that was struck.  If you'd just

3    read the rules of the Court, you don't file discovery matters

4    with the Court.

5            **MR. TAYLOR:**  Yes, ma'am.  Well, in any case, the

6    argument is this -- is that obviously we have a very specific

7    tire that is involved in the accident involving the Idar

8    family.  We know a lot about that tire and what the *Toe* and the

9    *Petersen* documents go to are years and years prior to this tire

10   and when -- and how this tire was made.  In other words, those

11   documents would encompass formulas that weren't even in place

12   and being used when the Idar tire was being manufactured.  They

13   deal with design, plant specifications and any number of

14   different components of the tires that have nothing to do with

15   the Idar tire itself.

16            In addition to that, Plaintiffs haven't met their

17   burden under the rules for trade secret document --

18   confidential, proprietary and trade secret documents.  If we --

19            **THE COURT:**  Are you calling these trade secret

20   documents?  I thought you said they were completely outmoded.

21            **MR. TAYLOR:**  Well, they're not completely outmoded

22   because what happens is, your Honor, is that, you know, we have

23   any number of more than 200 competitors around the world who

24   are at various stages of getting up and running as tire

25   companies and so what may look at -- into other manufacturers

who are up to speed like Cooper is has some sort of outdated or

outmoded procedure and, in fact, could be used to gain a

competitive advantage over Cooper if one of these other

entities, these other tire companies somewhere in some third-

world country is trying to get up and running has the benefit

of the research and the time and the effort and the money that

Cooper has expended on doing research to develop and design

certain tires and so they're not outdated and outmoded although

they are far attenuated from when and what is actually going on

in the Idar tire.

But Plaintiff hasn't presented the Court with

anything -- nothing, absolutely nothing with regard to why

those documents are relevant and necessary to a fair

adjudication of their claims and that's the burden they have to

reach in order to get to those documents and they have not done

that.

**THE COURT:** Which documents are you claiming are

trade secrets? Are they the same ones that have been already

presented in *Toe* and *Petersen*?

**MR. TAYLOR:** Yes, ma'am. They were presented under

protective orders, absolutely. They --

**THE COURT:** Well, you have a protective order here.

**MR. TAYLOR:** Yes, ma'am, I understand.

**THE COURT:** So you just present them under a

protective order.

1    **MR. TAYLOR:** And we've come to the Court several

2  times about the protective order and obviously I understand the

3  Court's position and I'm not asking the Court to rehash that

4  today but at the same time obviously you know Cooper's position

5  in that it believes that the protective order in place doesn't

6  give it the necessary protections that it should be afforded

7  for its property to be put out there in litigation.

8    **THE COURT:** Well, what documents are you -- exactly

9  are you claiming are trade secrets?

10    **MR. TAYLOR:** Well, there are a number of documents

11  and what we've done is we've included in a privilege log that

12  we've given to Mr. Gsanger the documents that we state, here

13  are the documents that we would affirmatively use. These are

14  the trade secret, confidential and proprietary documents that

15  we would affirmatively use that we're withholding and then in

16  terms of the request for production, what we have is we have a

17  number of objections that go further than that into the breadth

18  and depth of the discovery.

19    **THE COURT:** Well, those are overruled. I just want

20  to know what the -- what your trade secret documents are.

21    **MR. TAYLOR:** The trade -- there's a -- there is a

22  privilege log out there as to the ones that we would be

23  affirmatively offering under Rule 26.

24    **THE COURT:** Well, you need to identify those if

25  you're going to -- how long has it been since you've tendered

1    these requests for production, Plaintiff?

2           **MR. GSANGER:**  Your Honor, we tendered these requests

3    for -- well, we asked for the documents in letters in August

4    and when we didn't get them through the informal -- the

5    disclosure process under Rule 26 as we had requested, then we

6    formally filed a request for production in mid-November and

7    one --

8           **THE COURT:**  So here we are in February and you still

9    don't have them?

10          **MR. GSANGER:**  We still don't have them.  We -- and

11   we kept thinking -- we kept getting the impression from Cooper

12   that we were going to get these documents when the Court

13   entered the protective order and then when the Court did enter

14   the protective order, we got the idea we were going to get

15   these documents when the Court overruled the motion for

16   reconsideration and then when the Court did overrule the motion

17   for reconsideration, we thought we were going to get the

18   documents but we didn't and then we thought we'd get them when

19   the Court overruled the second motion for reconsideration and

20   that is why we have ultimately decided we just need to file a

21   motion to compel and that was why we wanted to set this

22   conference up to see if the motion to compel would become

23   necessary.

24          **THE COURT:**  Well, I don't see anywhere in the

25   response Cooper's response where they've identified any trade

1   secret documents.

2          **MR. GSANGER:**  Your Honor, the privilege log that they

3   provided has to do with the privilege log of documents that

4   they wished to offer to us.  It's not a privilege log that has

5   any relationship to the documents that we requested.  There's

6   no privilege log that makes any reference topside or bottom to

7   the documents that we requested and one thing I would note is

8   this.  As you may recall, your Honor, that Document Number 8 in

9   this case was a motion to strike Plaintiff's pleadings and in

10  Footnote Number 2 to Document Number 8 -- this is a document

11  signed by Cooper's attorneys -- it says most of the documents

12  characterized in Paragraphs 90 through a hundred and sixty of

13  Plaintiff's original complaint appear to have been produced to

14  Plaintiff's counsel in one or more cases including the Iowa

15  State Court case of *Toe versus Cooper*.

16         Well, obviously then if they're saying that our

17  allegations, which are the ones that are set forth in

18  Paragraphs 90 through a hundred and sixty of our complaint,

19  appear to be documents that they produced in *Toe* and other

20  cases, well, then that's naturally why we feel like, well,

21  gosh, then obviously then you've admitted that those documents

22  produced in *Toe* and in *Petersen* are the ones that you're

23  directly responsible -- directly responsive to our Paragraphs 1

24  through -- I mean, 90 through 160 in our complaint.

25         **THE COURT:**  In all the requests for production, is

1  this right, Mr. Taylor and Mr. Trent, the request for

2  production, the Bates stamps numbers are the documents directly

3  from *Toe* and *Petersen*?

4        **MR. TAYLOR:** Your Honor, what they did is they made a

5  general request for specific documents -- or excuse me -- a

6  general request for the *Toe* documents and then they've made a

7  specific request under *Petersen* for the *Petersen* documents by

8  Bates numbers listed on a certain exhibit.

9        **THE COURT:** Okay. And I didn't see -- I've got the

10  responses here. I didn't see any identification of a -- by

11  Bates stamp of any document that's claimed to be trade secrets.

12        **MR. TAYLOR:** Well, there is a general statement

13  leading into the responses, your Honor, that talks about trade

14  secret documents and the fact that these are -- Number 1 would

15  be the preliminary statement of --

16        **THE COURT:** Would you state your name, please?

17        **MR. TAYLOR:** -- objections and I believe --

18        **THE COURT:** State your name.

19        **MR. TAYLOR:** I beg your pardon?

20        **THE COURT:** Your name?

21        **MR. TAYLOR:** Oh, I'm Raph Taylor for Cooper Tire. I

22  apologize.

23        **THE COURT:** Okay, thank you.

24        **MR. TAYLOR:** Number 1, we talk about the fact that

25  there are concerns about the confidentiality and the privacy of

1  Cooper's property interests that are at stake here and then

2  again in both -- in Paragraph 6 also talks about that and then

3  Paragraph 7 also talks about the confidential proprietary

4  nature of the documents.

5        THE COURT:  Well, you have to identify these by -- if

6  they're Bates number, you need to identify them.  I mean,

7  that's -- you have already lost your opportunity.  It's been 30

8  days for you to do that with some particularity.

9        MR. TAYLOR:  Well, your Honor, these massive open-

10 ended requests that we've gotten from Plaintiffs especially

11 with regard to these *Toe* documents don't necessarily lend

12 themselves to responding in that way and --

13       THE COURT:  Well, I don't know why not.  If they've

14 been identified by Bates number, you ought to be able to say,

15 these are trade secrets, Bates Numbers 1000 through 1050 or

16 something like that.  I don't know how difficult that is.

17       MR. TAYLOR:  Well, and I -- sorry, your Honor, Raph

18 Taylor for Cooper Tire.  Just turning, for instance, to Page 8,

19 there's a broad, open-ended request here, "Knowledge that

20       Cooper's tires would benefit from improved durability

21       with respect to the tires' susceptibility to tread

22       and belt separations."  That's a broad, sweeping

23 request that is not specific to a Bates number out of the

24 *Petersen* case.  It's not just, give me the *Toe* documents.  Now

25 it's just generalized, hey, here's what we want.  Here's a

1  category that doesn't really apply necessarily to the documents

2  and the type of work that Cooper does in terms of how it --

3          **THE COURT:** Well, you're basing all your objections

4  on your -- on the inappropriateness of a protective order and

5  I've already overruled that. So you need to give them the

6  documents.

7          **MR. TAYLOR:** Is that as to all the requests for

8  production, your Honor?

9          **THE COURT:** The ones I have in front of me are just

10 Request for Production Number 1 with subparts.

11         **MR. TAYLOR:** Right. Through Subpart, I believe, VV,

12 your Honor.

13         **THE COURT:** No, I've got -- yeah, VV, V as in Victor.

14 And then you have not answered interrogatories?

15         **MR. GSANGER:** Yes, your Honor. This is John Gsanger

16 on behalf of the Plaintiffs. The first interrogatory is more

17 or less inclusive of the Interrogatories Number 4 -- I mean,

18 Number 2 through 5. So we can skip that first interrogatory.

19 The second interrogatory -- the first interrogatory which I

20 seek to compel an answer to, which is Interrogatory Number, if

21 we've asked for the identification of employees or ex-employees

22 who worked at the Tupelo, Mississippi plant in the winter of

23 2003, that's the exact plant where our tire was made during the

24 exact part of the year -- during the year when our tire was

25 made.

1          I've asked for job descriptions and contact

2   information for the people who were involved in splicing

3   components for the tire, for building the tire, first stage and

4   second stage of tire-building and for doing any kind of

5   inspection and sorting and classification of the tires after

6   they are cured.  That's to say basically once people start

7   putting the tire together on a tire-building drum, we want the

8   names of those employees who worked with those jobs at the

9   plant where the tire was made who worked during the season when

10  the tire at issue was made -- during the year when the tire at

11  issue was made.  We want to have their contact information and

12  some of their job descriptions and we also want not just the

13  tire builders but also the tire inspectors, the persons who

14  look at and inspect the tire and classify the tire.

15          THE COURT:  So the objection is that it's too

16  onerous?  How onerous is it?  Have you attempted to get this

17  information?

18          MR. TAYLOR:  Yes, your Honor, Raph Taylor here for

19  Cooper Tire.  A couple things that make it -- one, it is

20  onerous.  Two, again --

21          THE COURT:  How is it -- you can't just say it's

22  onerous.  You've got to tell me that you've made inquiries and

23  this is what the result was.  You just can't make these

24  allegations.  So what are they?  Why is it onerous?

25          MR. TAYLOR:  Yes, your Honor.  Because we have to go

1   back -- the way the question is raised, not only do we have to

2   go back and identify each and every individual who may have

3   been at the plant during that three-month period in 2003, which

4   is almost eight years ago, then we have to go through and

5   figure out exactly what their job description was and what that

6   job description may have entailed that might fit them within an

7   answer to this interrogatory -- whether or not they fit into an

8   answer --

9           **THE COURT:**  Well, how much trouble is that?  Have you

10  asked somebody?

11          **MR. TAYLOR:**  Absolutely, your Honor.  We have begun

12  working on that and I know that thus far it has taken somebody

13  at least 40 hours to try and put those names together that --

14  just to start from to then go to the personnel file and start

15  digging through the personnel file and that -- the other

16  overarching concern here, your Honor, is as Mr. Gsanger has

17  brought up since the beginning about the identities of his

18  Plaintiffs and their private information is, again, by

19  answering this interrogatory without the necessary protection,

20  we're exposing our current and former employees to all sorts of

21  privacy concerns having their names and addresses and phone

22  numbers out there in litigation without protection.

23          **THE COURT:**  I have entered a protective order.  So

24  that is not an appropriate reason to fail to respond to this

25  interrogatory.  So, I mean, if all of your objections are in

1  the protective order I entered, they're not going to go very

2  far.  Do you understand?

3          **MR. TAYLOR:**  Yes, your Honor.  And the -- it

4  obviously goes to the overbroad nature and the fact that

5  anybody --

6          **THE COURT:**  Well, that's overruled but how many

7  employees did you have during that time period at Tupelo?

8          **MR. TAYLOR:**  I mean, you know, your Honor, I'd have

9  to go back and find out exactly but let me --

10          **THE COURT:**  Well, wouldn't you have -- I would have

11  thought -- I'm sorry.  I would have thought that that would be

12  something you would have on hand since you're complaining that

13  it's so onerous.

14          **MR. TAYLOR:**  Absolutely.  And part of it is having

15  the class done, do we take all of the employees that were

16  employed at the plant at that time because technically they

17  could all fall in here and so each of their personal files will

18  have to be examined to determine whether or not their job

19  description or duties included, you know, the splicing,

20  building or inspecting of passenger or radial light truck tires

21  from any stage.  Again, that could encompass, you know,

22  everyone in the plant because everyone in the plant has some

23  form of duty to be looking out at what's going on in the plant

24  and what's -- how the tires are being built and that sort of

25  thing.

1          So, again, it doesn't really narrow the scope by

2     saying, here are their job descriptions of just the people we

3     want.  Now, if you want the job description -- if you want the

4     people who built the tire -- if we can identify the people who

5     were building tires during that three-month period, that's a

6     much less onerous task so that then he can figure out whether

7     or not he wants to go depose these people and, in fact, you

8     know, if there's a builder's tag in the tire -- which I don't

9     believe there is in this case -- it could actually identify

10    these specific individuals who built the tire.

11          **THE COURT:**  I'm sorry.  He can't do that without the

12    information of who they are and what their job was.  So I'm not

13    understanding what the problem is with disclosing this

14    information.

15          **MR. TAYLOR:**  Well, if -- your Honor, Raph Taylor for

16    Cooper Tire.  It is -- it goes to the fact that if we -- when

17    you read the interrogatory at its face, what it says to me is,

18    you know, basically anybody who during a pre-cure or post-cure

19    stage had a duty to look at the tire, to inspect the tire to

20    see what was going on -- I mean, the way the terms are used in

21    that, it could be anybody from the guy at the mixing station to

22    the guy --

23          **THE COURT:**  Well, but if you don't have a number, I

24    don't know why it would be -- why you can tell me that it's

25    onerous to get this information.  You said it -- you've already

1  gotten the names.

2          **MR. TAYLOR:**  Yes, ma'am.  I just don't want to give

3  the Court a number that I am wrong about off the top of my

4  head.  I apologize.  I just don't have that at my fingertips

5  right here but I know -- I do know that it is quite a few and I

6  do know that there -- and --

7          **THE COURT:**  Well, I don't know what "quite a few"

8  means.

9          **MR. TAYLOR:**  Yes, ma'am.  I would --

10          **THE COURT:**  I don't have a clue.  So you must provide

11  that information.  That objection is overruled.

12          **MR. TAYLOR:**  Okay.

13          **MR. GSANGER:**  Your Honor, the -- this is John Gsanger

14  again on behalf of the Plaintiffs.  Interrogatory Number 3 is a

15  very similar interrogatory that, again, asks for contact

16  information and certain job description information with

17  respect to Cooper's ex-employees and employees who worked at

18  Cooper's regional inspection points and what a regional

19  inspection point in Cooper lingo is the same thing as what an

20  adjustment center is referred to in Michelin or Continental

21  lingo.  This regional inspection point is the area where a tire

22  that gets returned under breach of warranty where, you know,

23  you buy a tire from Discount Tire and it falls apart in a

24  manner that makes you believe that you have a claim to get a

25  new tire under the warranty -- when that tire gets brought back

1    to the dealership, the dealership then sends it on to Cooper

2    and Cooper sends it to a regional inspection point.

3            **THE COURT:** So you want the regional inspection point

4    for Tupelo, Mississippi?

5            **MR. GSANGER:** Well, it's -- see, it's not quite laid

6    out exactly that way because they have a couple of regional

7    inspection points across the nation and if there was -- if it

8    was laid out such that all Tupelo tires went to Regional

9    Inspection Point Number 1, I'd be -- I'd have no problem

10   limiting myself to Regional Inspection Point Number 1.  I have

11   no -- I wouldn't have a problem with that but that is not, in

12   fact, how it works.

13           How it works is that Cooper tires, whether they're

14   made at the Tupelo plant or at, you know, the Texarkana plant,

15   they go to whichever regional inspection point is closest to

16   the area where the tire happened to have been returned.  I

17   mean, like if you buy a tire up in -- if the tire happens to be

18   made in Mississippi but it's sold into the market up in

19   Massachusetts and yet it fails out in California, it winds up

20   going to the regional inspection point that's closest to the

21   California area where it's returned.  It's not necessarily

22   broken down by plant of manufacture or even the area where the

23   tire went into the stream of commerce.

24           And so our request is not limited to any one given

25   regional inspection point although we'd be happy to if it could

1 be limited but it's not limited in that fashion because the

2 tire -- because that's not how the regional inspection points

3 are organized. So we just want the identification of the

4 employees with some job description information about Cooper's

5 regional inspection point personnel so that we can talk to them

6 -- identify them as witnesses and talk to them about how --

7 what is the actual methodology that Cooper actually employs

8 when determining whether or not a tire failed to cause a

9 material defect or a workmanship problem as opposed to whether

10 it failed in the course of use due to abuse because what we

11 find is that the standards that Cooper sometimes wants to --

12 want to employ in litigation are not the same standards that

13 they like to employ -- or that they do actually, in fact,

14 employ in the real world.

15 And so what we'd like to do is take the depositions

16 of people who do these kinds of analyses in the real world in

17 the business context. We'd like to have the information not

18 only to be able to show that, you know, whatever their hired

19 litigation experts say, if you do a real-world analysis on this

20 claim, the actual standards and practices that are employed in

21 the actual sale and warranty-return analysis of tires in

22 Cooper, well, then this tire is clearly a defective one. We'd

23 like that both for -- to get evidence in front of the jury and

24 as you can imagine, it's also very, very valuable in being able

25 to respond to the Daubert motions which inevitably get filed in

1   these cases.

2           **THE COURT:**  And your response?

3           **MR. TAYLOR:**  Yes, your Honor, Raph Taylor for Cooper

4   Tire.  A couple things that I need to point out to the Court

5   about what these regional inspection points are and what they

6   are not because there is a little bit of a misconception going

7   on right now.  These regional inspection points receive tires

8   from dealers across the nation by region and these regional

9   inspection point employees are not trained nor do they even

10  attempt to do a forensic analysis to determine why the tire

11  failed.  Their sole job, your Honor, is to make a note of a

12  condition.  They have a list of condition codes that are about

13  a hundred and eight items long and all they do is they look at

14  the failed tire.  They note a condition code in the computer

15  and then the tire is sent on.  They are not putting their hands

16  on it and putting it under extreme light and doing a full

17  forensic examination as a tire expert would.

18          The other thing that makes this request so -- to say,

19  oh, we need to know about it because we need to know what

20  they're doing and how they're doing it, the corporate

21  representatives have said and will continue to tell them in

22  testimony time and time again how these inspections are done,

23  how these condition codes are determined at these regional

24  inspection points.

25          The other thing that makes this request completely

1  irrelevant to this case is the Idar tire never went through one

2  of these regional inspection points.  It failed while in

3  service.  From what I understand of the chain of custody, it's

4  been in either an investigator or a Plaintiff attorney's hands

5  or one of their experts since that time and they have the chain

6  of custody for it.  So there's no analysis that was done by a

7  Cooper employee at a regional inspection point with regards to

8  the Idar tire itself.  It's completely irrelevant.  The

9  testimony would simply be here's -- we look at these tires and

10  we do the coding.  It's testimony that they can get from a

11  corporate representative.  They don't -- they do not need the

12  names and identifications of these employees out there.  It

13  makes no sense to this case.

14         **MR. BALL:**  Your Honor, this is Wesley Ball for

15  Mr. Idar, if I could add one bit to that.  I was counsel in the

16  *Toe* matter and we went over the regional inspection point

17  centers at very -- very in-depth length and one thing that

18  Mr. Taylor left out there is not only do these people record --

19  the regional inspection people record the condition of the tire

20  but we have found that in a number of instances, they will

21  change the condition that the dealer has originally recorded to

22  the condition that they believe -- the regional inspection

23  point people believe was the cause of the failure.

24         So for instance, your Honor, if the dealer coded the

25  tire as a tread separation, which that is normally a code of

1  Number 32, we have found through printout from these regional

2  inspection points on specific tires that 32 will actually be

3  changed by the regional inspection person to another cause of

4  the separation.  For instance, maybe they might code it as

5  under-inflation or impact or something of that nature and in

6  doing that, your Honor, that reduces the number of tread

7  separations that Cooper recognizes and the number of tread

8  separations that Cooper would have to then thereafter report to

9  the Federal government under The Tread Act and you can follow

10 it on down the line, potentially resulting in Cooper not having

11 to recall tires or have an outlook on the numbers that is

12 different from the reality.

13        So it's what those regional inspection point people

14 who do that that's something that I believe it is necessary to

15 get into.  We've done it in other cases and it does prove

16 exactly how Cooper is looking at their tires and sort of a

17 motivation behind what they're doing at this point.

18        **MR. TAYLOR:**  May I briefly respond, your Honor, Raph

19 Taylor for Cooper Tire?

20        **THE COURT:**  Yes, sir.

21        **MR. TAYLOR:**  Just very briefly, it's important to

22 note on what Mr. Ball is talking about.  The fact that the

23 dealer, when they actually code the tire as to what they think

24 they see in the tire, they have about eight codes to go from.

25 The regional inspection point employees have a hundred plus

1   codes to go from to actually make a decision as to what they're

2   seeing in the tire.  He said something that is very telling and

3   incorrect in that he says that, well, they're determining the

4   cause of the separation.  They are not determining the cause of

5   the separation.  They are simply noting what the condition is

6   that they see in the tire.

7           **THE COURT:**  Do you have people that are in charge of

8   each one of these centers and if so, how many centers are

9   there?

10          **MR. TAYLOR:**  There are four centers in the United

11  States and, yes, there is one Cooper corporate employee that

12  would be in charge of those centers.

13          **THE COURT:**  If it's just one employee that's in

14  charge from 2003 -- I'm talking about if they could depose one

15  person from 2003 to now, would there be a big turnover in the

16  people in charge?

17          **MR. TAYLOR:**  Probably not, your Honor.  I think there

18  might be one or two that they would have to depose if that were

19  the case from 2003 to present.

20          **THE COURT:**  Well, why don't we just start with giving

21  them the information for the people who have been in charge of

22  each of those four centers from 2003 to present that have

23  inspections of passenger or light tire trucks made in 2003 at

24  Defendant's Tupelo plant?  And then you can do a 30(b)(6) for

25  each one of those centers and if the head of the division can't

1    answer it, they can find somebody who can.

2           **MR. TAYLOR:**  Yes, your Honor.

3           **MR. GSANGER:**  Your Honor, this is John Gsanger on

4    behalf of the Idar family.  Should I move on to Interrogatory

5    Number 4?

6           **THE COURT:**  Okay.

7           **MR. GSANGER:**  This one is actually a pretty simple

8    one.  I'm not even sure I understand.

9           **THE COURT:**  Well, let me just ask the objection to

10   this one.

11          **MR. GSANGER:**  Okay.

12          **MR. TAYLOR:**  Yes, your Honor, Raph Taylor for Cooper

13   Tire.  In terms of Interrogatory Number 4, first off, frankly

14   we don't understand the terminology, what they mean by "tire

15   lines."  There are --

16          **THE COURT:**  Why don't you-all talk about that right

17   now and see if you can -- I don't mind you doing that instead

18   of just addressing me.  If you could try to get that clear

19   between you, you may be able to work out something.

20          **MR. TAYLOR:**  John -- Mr. Gsanger, are you talking --

21          **MR. GSANGER:**  Well, Raph -- yeah, I can tell you --

22          **MR. TAYLOR:**  -- about tire lines in terms of brand

23   names of tires?

24          **MR. GSANGER:**  Yes.

25          **MR. TAYLOR:**  Is that what you're getting at?

1          **MR. GSANGER:**  Yes, I am.

2          **MR. TAYLOR:**  Okay.

3          **MR. GSANGER:**  Same way it normally is talked about at

4    the depositions, brand names.

5          **MR. TAYLOR:**  Well, and it is different but anyway --

6    your Honor, Raph Taylor for Cooper Tire.  Here's where the

7    objection lies.  Cooper may make any number of different brand

8    of tire or put a stamping brand name on the side of a tire that

9    is made to a specific Green Tire Specification --

10         **THE COURT:**  Okay.

11         **MR. TAYLOR:**  -- or a blueprint for that tire and so

12    to simply, say, you know, list all tires made by Cooper at a

13    certain site during 2003 with the Cooper Trendsetter SE on the

14    side of it, that could encompass any different number of Green

15    Tire Specifications, any number of different brands that were

16    out there.  It is a -- it's one of those and you look at and

17    you go, well, it seems pretty simple but at the same time what

18    it does is it's going to confuse everybody because we're

19    getting away from similar product and similar tires.

20         **MR. GSANGER:**  Your Honor, this is John Gsanger on

21    behalf of the Plaintiffs.  May I respond?

22         **THE COURT:**  Yes.

23         **MR. GSANGER:**  I mean, the question about whether it's

24    going to confuse anybody, that sounds to me like perhaps it

25    might be something to raise in motions in limine but that

1  certainly seems like an admissibility concern, not a

2  discoverability concern.  I mean, I'm not confused nor do I

3  believe is Mr. Taylor confused by, you know, a question, tell

4  me the brand names that you made that were in a P21575R14 size

5  at any time during 2003.  That's not -- it's not an opaque

6  question and then the other question is, just tell me the tires

7  you made that have the words "Cooper Trendsetter SE" stamped on

8  the sidewall from the tire period from 1993 to 2000.

9         The truth is, you know, this is information that if I

10 had a complete library of tire design tread guides, you know, I

11 could probably -- if I was -- you know, if I was Cooper -- if I

12 have access to Cooper's library, I could answer this question

13 in about 15 minutes at their library but I don't have access to

14 Cooper's library.  This is just a pretty simple question that

15 says, what tires did you make that fit in either this category

16 under -- or under this brand name stamped on the sidewall.  I

17 don't see how that confuses anybody and if it did confuse

18 somebody, you know, then that's something that could be

19 addressed at the admissibility stage.

20        **THE COURT:**  How difficult is that to answer, again,

21 Mr. Taylor?

22        **MR. TAYLOR:**  Your Honor, we can get that answer --

23        **THE COURT:**  Okay.

24        **MR. TAYLOR:**  -- probably within about a week or so.

25        **THE COURT:**  All right, thank you.  And then 5?

1          **MR. GSANGER:**  Okay, 5, your Honor, says, for all

2  those tires that we identify in Interrogatory Number 4, you

3  know, please tell me what size they were made and during -- and

4  what time period they were made.  It says, will you tell me

5  whether or not they had BEGS.  "BEGS" is -- stands for -- it's

6  an acronym for belt edge gum strips.  It's one of the safer

7  alternative designs that was not included in the tire issue but

8  which is included in some of Cooper's tires but frankly it's

9  not included in very many of Cooper's tires and so probably

10  their answer is going to be, you know, they'll -- out of all

11  the tires they identify, they might identify one or two that

12  had BEGS.  More likely than not, they'll identify none that had

13  BEGS.

14          Three is which of these tires that you identified in

15  Interrogatory 4 had SNOW.  Now, SNOW is another acronym.  It

16  stands for spirally -- spiral -- spirally-wound nylon over wrap

17  and that stands for SNOW.  And so of all those tires that were

18  identified, which ones had SNOW and their answer is likely

19  going to be none or if it is one or two of them, you know,

20  they'll just identify one or two that had SNOW.

21          And then finally, you know, tell me the last name

22  address or counsel's address and phone number -- let's say the

23  contact information -- for anybody who had a claim based on

24  personal injury or death or property damage alleging the tread

25  separation of one of these tires identified in Interrogatory

1   Number 4 and so basically what I'm trying to say is, you know,

2   identify those tires for me and then once you identify them for

3   me, tell me which ones had the very same sacral term designs

4   that we're talking about and tell me -- give me the property

5   damage and personal injury or death claims information in

6   relation to tread separations for those specific tires.

7        **THE COURT:**  How big of a number are we talking about

8   here, Mr. Taylor?

9        **MR. TAYLOR:**  Your Honor, it could be quite a few and

10  here's -- and I apologize for vagueness of that answer.  Here's

11  my problem and I'm looking at Interrogatory Number 4 when we're

12  talking about the sides and --

13       **THE COURT:**  You know what?  Why don't we start with

14  answering Interrogatory Number 4 and then we'll follow up on

15  5 --

16       **MR. TAYLOR:**  Yes, your Honor.

17       **THE COURT:**  -- at another -- I'm going to put that

18  off to another time -- in two weeks' time.  How's that?

19       **MR. GSANGER:**  That sounds great, your Honor.

20       **MR. TAYLOR:**  Yes, your Honor.

21       **THE COURT:**  And then maybe you'll have something put

22  together that we can talk about.

23       **MR. TAYLOR:**  It'd be easier.

24       **THE COURT:**  Anything else?

25       **MR. GSANGER:**  The only things that I could ask for in

1  addition, your Honor, is if we could have a deadline for

2  compliance with a request for production that we talked about.

3          THE COURT:  Let me ask Mr. Taylor what he thinks is

4  reasonable for that.  I mean, I -- you've already had several

5  months but on the other hand, you filed -- you did file

6  objections that were not brought to my attention until today.

7  So what do you think would be reasonable?

8          MR. TAYLOR:  Your Honor, I was thinking that maybe 30

9  days would be reasonable to gather the documents and --

10          THE COURT:  All right.  You had said one week -- I'll

11  give you two weeks for Interrogatory Number 4 and 30 days for

12  the rest.

13          MR. TAYLOR:  Okay, thank you, your Honor.

14          MR. GSANGER:  Your Honor, the last thing I would say

15  is that 30 --

16          THE COURT:  Okay, who is this?

17          MR. GSANGER:  I'm sorry, your Honor.  This is John

18  Gsanger.

19          THE COURT:  Okay.

20          MR. GSANGER:  I apologize.  I was wondering if

21  perhaps at the same time if -- and I'll talk to Counsel about

22  this.  Perhaps we may need to discuss putting back our expert

23  deadline if we're not going to get any discovery for 30 days

24  because that expert deadline is about six weeks away -- about

25  six weeks away now.

1          **THE COURT:**  Well, the problem with the expert

2    deadline is that I'm not going to expend the Daubert challenge

3    time.  So you-all need to talk about that and see what

4    agreement you can come up with.

5          **MR. GSANGER:**  Okay, your Honor, we'll do so.

6          **THE COURT:**  Thank you very much.  You're excused.

7          **MR. GSANGER:**  Thank you, Judge.

8          **THE COURT:**  I'm sorry.  Was somebody about to say

9    something?

10          **MR. TAYLOR:**  Yes, your Honor.  I'm sorry, Raph Taylor

11    for Cooper Tire.  Just one last thing, I believe that we are

12    still not receiving authorizations for medical records from

13    Plaintiff's counsel.  We've sent them to him a number of

14    different times saying we really need to have access to these

15    injured parties' medical records and need to be able to order

16    those --

17          **THE COURT:**  What's the problem with this,

18    Mr. Gsanger?

19          **MR. GSANGER:**  I have taken their requests and I have

20    forwarded them to my super competent and highly diligent

21    partner Angie Beltran and I understand that she has sent them

22    some replies but maybe they aren't liking the responses she's

23    gotten.

24          **THE COURT:**  Well, you have to give them a list of

25    every -- as I told you, every healthcare provider for five

1    years before the incident, mental, physical, contact

2    information and generally what they were seen for.

3             **MR. GSANGER:**  Yes, ma'am.

4             **THE COURT:**  I mean, you don't have to remember every

5    cold, every antibiotic, every whatever through the date of

6    trial.

7             **MR. GSANGER:**  I get that, your Honor.

8             **THE COURT:**  Obviously the person is dead.  So that's

9    going to end at the time of the incident but anybody else -- I

10   don't think anybody else has a mental anguish claim.  Neither

11   of the parents, do they?

12            **MR. GSANGER:**  No, I -- yes, Mrs. Idar does -- I mean,

13   she -- you know, she's a bystander even if she's --

14            **THE COURT:**  I'm sorry.  I forgot she was a bystander.

15   Mr. Idar was not a bystander.

16            **MR. GSANGER:**  He was in person.

17            **THE COURT:**  Yes.  So hers as well.

18            **MR. GSANGER:**  Absolutely.

19            **THE COURT:**  Now, that was supposed to be done at the

20   Rule 26 conference.

21            **MR. GSANGER:**  But it has been done.

22            **THE COURT:**  I need -- you need to get a list to the

23   -- of those providers to the Defendant and then you need to get

24   authorizations for release.  Now, I'm wondering if -- has there

25   been an estate probated or the Letters Testamentary from -- for

1 | any of these people?

2 | **MR. GSANGER:** No, because it was a minor child who

3 | was deceased and because the only two heirs at law would be the

4 | two parents because, of course, a ten-year-old child doesn't

5 | have any assets or any debts or is not married and doesn't have

6 | any children. The only two heirs at law would be the two

7 | parents and they apparently --

8 | **THE COURT:** So did the -- in the -- was there a

9 | divorce between the Idars?

10 | **MR. GSANGER:** That either has happened very, very

11 | recently or is happening very, very soon. Mr. Idar has only

12 | recently been released from prison and now that he's been

13 | released from prison, the divorce proceeding is in the works.

14 | **THE COURT:** Okay. So at the time of the death, both

15 | parents had equal rights, I'm assuming, to do medical -- to get

16 | medical care for the child?

17 | **MR. GSANGER:** True, correct.

18 | **THE COURT:** So then the mother ought to be able to

19 | sign a release?

20 | **MR. GSANGER:** Yeah, unquestionably. The parents are

21 | not in disagreement that the mother should act with full

22 | authority as representative of the estate and as next friend

23 | for the kids. There's no dispute in that.

24 | **THE COURT:** Well, the father wants to intervene.

25 | **MR. GSANGER:** Well, he wants to intervene on his own

1   behalf because he is the wrongful death beneficiary.

2           **THE COURT:**  Right.  Well, I'm going to grant the

3   intervention if I have not already.

4           **MR. BALL:**  Your Honor, this is Wesley Ball.  I do not

5   believe I've seen the order granting the intervention but we

6   have signed -- we have --

7           **THE COURT:**  Well, you know, I need to do that but

8   you-all need to get in the next three days authorizations to

9   all health and mental healthcare providers for the mother and

10  for the decedent.

11          **MR. GSANGER:**  Will do.

12          **THE COURT:**  I mean, that is well, well overdue.

13          **MR. GSANGER:**  Will do.  And I do believe that we -- I

14  mean, I know that we've given them a list of providers --

15          **THE COURT:**  Well, let's just --

16          **MR. GSANGER:**  -- and summary of what every provider

17  provided and I thought we had given some releases.  If we have

18  not, I will make sure that we do but I was fairly sure that we

19  had given some releases.  This is the first I've heard of it.

20          **THE COURT:**  Any other discovery problems?

21          **MR. TAYLOR:**  Raph Taylor for Cooper Tire, your Honor,

22  none that I'm aware of.

23          **MR. GSANGER:**  Well, the only -- I mean, we're

24  probably meeting shortly about a request to see the tire-

25  building machine and perhaps a visit to the document repository

1    in Ohio.

2          **THE COURT:**  Okay.  Didn't you -- that's Mr. Gsanger

3    talking.  Mr. Taylor, did you say that you'd not been allowed

4    access to the alleged defective tire?

5          **MR. TAYLOR:**  We have now, your Honor.  I'm sorry.

6    When we were there back in 2010, we had not had an opportunity

7    to even see it.  We have now seen it.  Thank you, your Honor.

8          **THE COURT:**  Okay, all right.  Thank you very much.

9          **MR. GSANGER:**  And I'm more than happy to make it

10   available on multiple occasions.

11         **THE COURT:**  Okay, thank you-all very much.  You're

12   excused.

13         **MR. GSANGER:**  Thank you, Judge.

14         **MR. TAYLOR:**  Thank you, your Honor.

15       **(This proceeding was adjourned at 4:06 p.m.)**

16

17

18

19

20

21

22

23

24

25

CERTIFICATION


I certify that the foregoing is a correct transcript from the

electronic sound recording of the proceedings in the above-

entitled matter.




_____          ___March 3, 2011 _



TONI HUDSON, TRANSCRIBER